## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE No. 01-00010-CR-GRAHAM/SIMONTON

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JARED L. D'ARGENIO,

      Defendant,

_____/

### REPORT AND RECOMMENDATION ON MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CONTEMPT FOR HIS FAILURE TO COMPLY WITH COURT ORDER

Presently pending before the Court is Plaintiff United States of America's Motion for Order to Show Cause why Defendant Jared D'Argenio should not be held in contempt for his failure to comply with the Court's Order to pay $500.00 per month towards his restitution judgment, ECF No. [261]. The United States has filed a Status Report Regarding Order to Show Cause Hearing, ECF No. [264], and a Supplement to that Status Report, ECF No. [265]. The Honorable Donald L. Graham has referred the Motion to the undersigned Magistrate Judge for a Report and Recommendation, ECF No. [271]. An evidentiary hearing was held on the Motion on April 19, 2018 and continued through April 20, 2018, ECF Nos. [277], [278].

For the following reasons, based upon a review of the record as a whole, as well as the evidence presented at the hearing, the undersigned RECOMMENDS that the Plaintiff's Motion be GRANTED and the Defendant be found in civil contempt of this Court's Order requiring him to pay $500.00 per month toward his restitution judgment, ECF No. [260]. The undersigned further recommends that the Defendant be ordered to

purge the contempt  by payment of $3,000.00 within fifteen days from the date that the
Court adopts this Report and Recommendation or finds the Defendant in contempt.  If
the Defendant fails to comply within fifteen days, the undersigned recommends that he
be incarcerated until such time as he complies.

I.   BACKGROUND

This matter involves the Defendant's failure to comply with his restitution
obligations in connection with a criminal judgment entered against him.[1]  The underlying
criminal matter was initiated when the Government filed an Indictment against the
Defendant and several co-defendants alleging conspiracy to commit wire fraud, eleven
counts of wire fraud, 24 counts of mail fraud, conspiracy to commit money laundering,
and 14 counts of money laundering, ECF No. [2].  In general terms, the Government
alleged that the Defendant purported to operate a financial consulting firm engaged in
the business of managing investments in the Foreign Exchange Market on behalf of
investors, International Capital Management, Inc. ("ICM"), ECF No. [2].  ICM raised
money from investors through commissioned sales agents who made high-pressure
calls to prospective investors using telephone scripts and various sales materials, which
scripts and sales materials contained materially false statements regarding how
investors funds were invested, the profit returns that ICM's programs were generating,
the amount of the annual management fee deducted from each investment, and the
procedures and protections surrounding investments with ICM, among other
misrepresentations, ECF No. [2].  In reality, ICM incurred substantial losses on behalf of
its investors, and additionally diverted a substantial portion of the investments to

---

[1] The Defendant has conceded that he has not made the payments required by the
Modification Order.  He argues herein that his failure arises from an inability to comply
with the Order.

support itself and related business entities and for the personal benefit and use of the defendants and others, ECF No. [2].

On July 6, 2001, the Defendant plead guilty to Count 1 of the Indictment, Conspiracy to Commit Wire and Mail Fraud.  As part of his sentence, the Defendant and his co-defendants were held jointly and severally liable for the payment of restitution in the amount of $9,057,374.00, ECF No. [123].  On March 19, 2002, the judgment was amended to adjust the restitution amount to $9,079,532.00, ECF No. [149].  On March 21, 2003, the judgment was again amended and the restitution amount reduced to $8,992,263.00, ECF No. [180].

On October 17, 2003, the Court entered an Order modifying the conditions of the Defendant's supervised release to set a restitution payment schedule which required the Defendant to pay the restitution at the rate of 10% of his monthly gross earnings, ECF No. [188].  The Court further ordered that, "the United States Bureau of Prisons, the United States Probation Office, and the United States Attorney's Office shall monitor the payment of restitution and report to the Court any material changes in the defendant's ability to pay."

On September 27, 2006, Defendant entered a Consent Agreement with the United States Attorney's Office wherein he agreed to pay $150.00 per month, beginning the first day of the month following the expiration of his supervision and every month thereafter until the obligation was satisfied, ECF No. [194].  The parties further agreed that a default in the agreement would result when the defendant failed to make three (3) of the installments and would entitle the United States to seek collection of the entire balance owed.  On October 2, 2006, the Court entered an order ratifying and approving the Consent Agreement and requiring the Defendant to pay according to the agreed schedule in the Consent Agreement, ECF No. [195].

On November 1, 2017, the Government filed a Motion to Modify the Consent Agreement, ECF No. [259].  Therein, the Government reported that the Defendant had not made a voluntary payment under the plan since December 17, 2009, though an involuntary payment in the amount of $10,899.96 was received on November 4, 2016, in response to a writ of garnishment issued at the request of the Government.  Following receipt of the involuntary payment, the Government had advised the Defendant that he was still subject to the monthly restitution payment and offered to negotiate a new monthly amount based on the Defendant's changed financial circumstances, but the Defendant refused.  Upon further investigation of the Defendant's finances, however, the Government determined that the Defendant was capable of paying more than $150.00 per month.  Thus, the Government requested that the Court modify the Defendant's restitution payments to $500.00 per month beginning on November 15, 2017, and continuing until the obligation was satisfied.  On November 21, 2017, the Court granted the Government's Motion to Modify Consent Agreement and entered an Order requiring the Defendant to pay $500.00 per month beginning on November 15, 2017, and to continue on the 15th day of each month thereafter, ECF No. [260] (the "Modification Order").

On January 26, 2018, the Government filed the instant Motion for Order to Show Cause why Defendant Jared D'Argenio should not be held in contempt for his failure to comply with the Modification Order, ECF No. [261].  The Government submitted that the Defendant had not made any payments pursuant to the Modification Order, ECF No. [261].

On February 6, 2018, the Court granted the Government's Motion and issued the Order to Show Cause requiring the Defendant to appear for a hearing on February 13, 2018, ECF No. [262].  Neither the Defendant nor his counsel attended the hearing on February 13, 2018, ECF No. [272].  On February 14, 2018, the Court issued an Order to

4

Show Cause why the Defendant's counsel should not be held in contempt for failing to appear at the hearing, ECF No. [266].  A hearing addressing both the initial Order to Show Cause why the Defendant should not be held in contempt for failure to comply with the Court's order of November 21, 2017, as well as the subsequent Order to Show Cause with respect to Defendant's counsel's failure to appear, was set for February 27, 2018, ECF No. [266].  At the hearing on February 27, 2018, the Court addressed defense counsel's failure to appear at the February 13, 2018 hearing.  The Court subsequently referred the initial Order to Show Cause regarding the Defendant's failure to make his restitution payments to the undersigned Magistrate Judge to hold an evidentiary hearing and issue a Report and Recommendation, ECF No. [271].

An evidentiary hearing was held on the Motion for Order to Show Cause, ECF No. [261], before the undersigned on April 19, 2018, and continued through April 20, 2018.

## II.   EVIDENTIARY HEARING

At the outset of the hearing the Defendant conceded that there was no dispute that the Court's Order of November 21, 2017, was valid and that the Defendant had failed to make the payments required by that Order.  The parties agreed that the only remaining issue was a determination of whether the Defendant had a present inability to comply with the Order and that the initial burden of production to prove such inability was on the Defendant.  Should the Defendant satisfy his burden of production to demonstrate an inability to comply, the ultimate burden of proof would then be on the Government to prove that he did have the ability to comply.  The Defendant was the only witness to present testimony at the hearing.

At the time of the hearing, the Defendant was employed as a consultant to Basalt America, a construction materials company in Oakland Park, Florida.  He is compensated

as an independent contractor on a weekly basis, and receives $1,000.00 for his services.[2] On a monthly basis, and deducting transaction fees charged by Paypal, the Defendant's monthly income is approximately $3,800.00.  The Defendant began working for the company in July or August of 2017 as a part-time unpaid intern and did not begin receiving compensation until October 2017.

 The Defendant resides in Del Ray Beach, Florida in a property owned by his father.  The Defendant pays $1,065.00 per month in rent and an additional $2,400.00 per year in maintenance fees.  The Defendant's electrical bill ranges from $100.00 to $300.00; his Comcast bill is approximately $200.00 per month; his water bill is $45-$55.00 per month; and his cell phone bill is approximately $100.00 per month.  The Defendant drives a 2017 Dodge Ram pick-up truck on which approximately 4 years of monthly payments of $572.00 remain.  The defendant's automobile insurance is approximately $2,400.00 per year. The Defendant uses the 2017 Dodge Ram as both his personal vehicle and in connection with the consulting services he provides.  He spends approximately $250.00 per month on gas for the vehicle.  After payment of expenses, the Defendant estimates that approximately $1,000.00 of his monthly income remains unspent.

 The Defendant's girlfriend and infant daughter also reside at the property.  The Defendant's girlfriend works outside the home for an online company and earns approximately $48,000.00 to $50,000.00 per year.  The Defendant's girlfriend does not contribute to the rent, maintenance fees, or utilities for the house.  According to the Defendant, his girlfriend does not contribute to the rent as a result of her own financial obligations, which include contributing to the welfare of their child, automobile and

---

[2] **The Defendant clarified that the payments from Basalt America appear as payments from "Paymeon, Inc." within his PayPal records, Government's Exhibit 4, because Paymeon, Inc. is the parent company to Basalt America.  The Defendant further noted that because he is currently working as an independent contractor, he has not paid taxes on his earnings.  Thus, he argues that though approximately $1,000.00 remains once the Defendant's known expenses are deducted from his monthly earnings, some of that money is intended to pay the taxes that will be due on his income.**

insurance payments, student loans, and other bills.  These expenses include a $450.00 monthly lease payment in connection with the Mazda CX9 leased by the Defendant's girlfriend.  The Defendant and his girlfriend share grocery expenses, but the Defendant is the predominant purchaser.  As to their infant daughter, the Defendant is generally responsible for formula and diapers, while his girlfriend pays for clothing for the child. The infant daughter is currently cared for by the Defendant's mother or her maternal grandparents when the Defendant and his girlfriend are working; the Defendant's girlfriend has committed to contributing as much as possible to a more permanent child care situation in the future.

Defendant is paid by Basalt America through PayPal.  Once he receives a paycheck, he transfers the funds to his business account.  From his business account he takes distributions to his personal account.  Because the timing of Basalt America's payment of the Defendant's weekly invoices is inconsistent, the Defendant attempts to get ahead on his rent and car payments when he receives payment and is able.  The Defendant estimated that, as of the time of the hearing, the balance of his PayPal account was approximately $300.00.

The Defendant also holds a business account with Wells Fargo Bank under the name DLJ Management, Inc. (the "DLJ Business Account").  DLJ Management, Inc. is a Florida corporation and the Defendant is the sole shareholder of the corporation.  Other than the DLJ Business Account, DLJ Management, Inc. does not have any other sources of income or other bank or investment accounts containing funds that belong to the company.  At the time of the hearing, the Defendant estimated that the DLJ Management Business Account held approximately $60.00 and that DLJ Management, Inc. had accounts receivables of approximately $4,880.00.[3]

---

[3] The accounts receivable for the DLJ Business Account includes approximately $1,000.00 in reimbursements for expenses paid out of pocket by the Plaintiff, in addition

Defendant also has a personal checking account at Wells Fargo that he uses primarily to pay for household items, food, and family expenses.  The Defendant testified that it is unlikely for there to be more than $1,000.00 in that account at any time.

Defendant also has a business account with TD Bank under the name Emotions Holdings, LLC ("Emotions Business Account").  The Defendant maintains enough money in the account, approximately $50.00 to $60.00, to meet the required account balance, but the company has no income or accounts receivable and is not currently active. Emotions Holdings, LLC is a Florida corporation and the Defendant is the sole shareholder.

The Defendant does not have any investment accounts or interest in any bank accounts outside of those previously described.  The Defendant does not own any property or significant assets, with the exception of the financed 2017 Dodge Ram truck previously discussed.[4]

The Defendant next provided testimony as to specific transactions reflected in his financial records.  In January or February of 2018, the Defendant, on the basis of a referral he received, installed a voice over IP phone system to North American Relocation and was paid $3,600.00.

The Defendant testified that, with the exception of the income streams noted above, he has not received income from any other sources in 2017 and 2018.  He did, however, borrow money from family and friends, and any previously undiscussed payments reflected in his accounts over $1,000.00 were charity payments from friends and family.

---

to outstanding invoices for four weeks worth of consulting services rendered by the Defendant at $970.00 per week.

[4] The Defendant could not recall the exact amount of equity he held in his truck, but estimated it to be insignificant, given the depreciation in the value of the vehicle since he began making payments.  The Defendant made a $5,000.00 down payment on the truck initially.

During the years 2015 through 2018, the Defendant held a Barclays Black card, an American Express platinum card in the name DLJ Management, Inc., and a Capital One Visa card.  The defendant additionally held a second Capital One credit card, but it's had no activity other than payment of the $75.00 annual membership fee for many years.

The Defendant's Barclays Black card currently has an outstanding balance of approximately $40,000.00 to $45,000.00.[5]  The card has been inactive since the summer of 2017.  The Barclays Black card was the primary card used by the Defendant to pay expenses and was used for both business and personal purposes prior to the Defendant's obtaining the American Express corporate card.  The Defendant testified that $30,000.00 of the outstanding debt on the Barclays Black card is attributable to Mr. Christopher Liva.[6]  Mr. Liva is a friend of the Defendant and required access to a credit card that would not be reviewable by his mother and wife.  The Defendant allowed him to use the Barclays Black Card issued in the Defendant's name starting in approximately 2015, and after several months had a separate card issued on the same account in Mr.

---

[5] On redirect the Defendant testified that the outstanding balance on this account was approximately $46,000.00.

[6] The Defendant and Mr. Liva executed a Settlement of Debt Agreement on August 16, 2017, that requires Mr. Liva to pay $30,000.00 to the Defendant in six monthly installments of $5,000 each.  According to the Defendant, Mr. Liva made a single payment of $2,500.00 around the time of the execution of the Agreement, and has made no payments since that time.  The Defendant has asked Mr. Liva to make payments several times but has been told that Mr. Liva is unable; the Defendant has taken no additional steps to enforce the Settlement of Debt Agreement.   At the time of the hearing, Mr. Liva was awaiting sentencing following his plea of guilty to charges of health care fraud and conspiracy to commit money laudering.  *See United States v. Physicians Surgical Group, LLC et al*, No. 1:14-cr-00447-JRA (N.D. Ohio filed Dec. 17, 2014) ("*U.S. v. Liva*").   On June 26, 2018, Mr. Liva was sentenced to 78 months in prison.  *U.S. v. Liva*, ECF No. [453].  The docket in that matter reflects that Mr. Liva was required to report to the Bureau of Prisons to begin serving his sentence on September 18, 2018.  *U.S. v. Liva*, ECF No. [473].

Liva's name.   The card was shut down in 2017 as a result of the Defendant's failure to make the minimum payments required on the outstanding balance and the Defendant has made no payments to that card since that time.  Barclays is currently trying to collect on the outstanding debt.

The Defendant's corporate American Express card, held in the name DLJ Management, Inc., has been shut down since approximately October or November of 2017 and does not have an outstanding balance. The card was opened in late 2015 and the Defendant was not the only authorized user.  Elena Liva, Gregory Orr, and a man named Philip, whose last name the Defendant could not recall, were all authorized users in addition to the Defendant.  The Defendant was responsible for payment of all charges incurred on that credit card.  Some of the charges incurred on the corporate American Express card were incurred in connection with the Defendant's work for Pop's Pharmacy, and Pop's Pharmacy would make payments to American Express directly on the Defendant's behalf.

The Defendant's Capital One Visa card is currently active and has a current balance of about $14,000.00.  The Defendant has a credit limit on the card of $30,000.00. The Defendant testified that he primarily uses the Capital One Visa card for expenses incurred in connection with his current consulting position; it is also used for personal expenses.  The company reimburses the expenses incurred on their behalf and the Defendant uses that money to make the minimum required payment.  There are no other authorized users for that card at this time.

Prior to 2015, the Defendant opened two credit lines for use by DLJ Management, Inc., one with Chase Bank and a second with Wells Fargo.  Both lines of credit have been shut down, the Chase Bank line of credit in approximately April of 2015, and the Wells Fargo line of credit in April or May of 2017.  The Chase credit line had a limit of $25,000.00 and there is currently $20,000.00 outstanding; the Wells Fargo credit line had

a limit of $65,000.00 and there is currently $58,000.00 outstanding.  The Defendant last made a payment on the Chase line of credit in approximately the summer of 2017; both accounts have been turned over to the internal collections department, but neither bank had filed suit to collect on the debt at the time of the hearing.

The Defendant was previously employed by Pops Pharmacy to provide consulting services and eventually transition into the acting manager at its Deerfield Beach pharmacy from December 2015 through July of 2016.  It was intended that the Defendant would take over management of the pharmacy after the acting manager departed, but that departure never came to pass and the Defendant's services were no longer needed. The Defendant was paid $12,500.00 per month for his services to Pops Pharmacy.

The Defendant additionally testified that he is a signatory and guarantor to a promissory note in the amount of $250,000.00 and that a lawsuit has recently been filed in a Florida state court in the northern part of the state to enforce that note.  The Defendant did not receive any of the borrowed funds; the borrower was a company named Remed Pharmacy.  The Defendant did not know whether he could be found liable for the full amount of the promissory note.

On cross-examination, the Government focused on the large number of significant discretionary expenses within the Defendant's financial statements.  The Government reviewed Defendant's Exhibit 3, which reflects the transaction history in the Defendant's Personal Checking Account from January 3, 2017, through March 13, 2018, with the Defendant and confirmed the accuracy of the following items therein with the Defendant: a March 12, 2018 charge in the amount of $29.61 for a restaurant named Boheme Bistro; a February 20, 2018 charge for $30.04 at a deli named Way Beyond  Bagels; a February 20, 2018 charge in the amount of $28.91 at Total Wine and Liquors; a February 16, 2018 charge in the amount of $39.64 at a butcher named The Meating Place; a February 4, 2018 charge in the amount of $30 from ring.com, which the Defendant testified was a recurring

monthly charge to pay for his video door bell service[7]; a February 12, 2018 charge in the amount of $78 from a restaurant named Favorites Pizza in New York; a February 6, 2018 charge in the amount of $46.08 from Delivery Dudes, a home food delivery service; a January 22, 2018 charge in the amount of $100.32 from Macy's; a January 22, 2018 charge in the amount of $53.48 from Nordstrom's; a January 22, 2018 charge in the amount of $101.65 from Foot Locker; a January 22, 2018 charge in the amount of $27.81 from Dick's Sporting Goods; a January 22, 2018 cash withdrawal in the amount of $500.

The Defendant additionally confirmed that between July 2017 and October 2017, the Defendant made four separate deposits totaling $930.00 into his Personal Checking Account.  Additionally, the Defendant confirmed that between January 24, 2017 and March 27, 2017, he received cash back rewards from his Barclays Black Card in the form of 14 separate deposits of $499.50 each and one deposit in the amount of $276.09.

In its examination of the Defendant, the Government then confirmed the accuracy of certain transactions reflected in the DLJ Business Account, Defendant's Exhibit 4. The Government confirmed the following transactions: a February 5, 2018 charge in the amount of $25.74 at a restaurant called Beehive Kitchen; a January 16, 2018 charge in the amount of $35.94 at a restaurant named Bangkok Thai; a December 28, 2017 charge in the amount of $35.15 for payment of security services provided by ADT Security, which the Defendant testified this was a quarterly service fee; a September 5, 2017 payment in the amount of $3,000.00 to Capital One; two payments on January 16, 2018 to Sun Biz for a total amount of $288.75; [8] and an August 25, 2017 charge in the amount of $75.00 to ADP for payroll services.[9]

---

[7] The Defendant testified that he thought he received the doorbell as a gift, although he could not be certain.

[8] The Defendant testified that these payments were made to the State of Florida for the annual reporting fees for DLJ Management, Inc., in the amount of $150.00, and Emotion Holdings, in the amount of $138.75; the Defendant confirmed that Emotion Holdings does

Next, the Government confirmed the accuracy of certain transactions reflected in the Defendant's Paypal records.  Government's Exhibit 4. Therein, the Government emphasized the following charges: a February 8, 2018 charge in the amount of $103.36 for a clothing purveyor named Marmot Mountain; a January 18, 2018 charge in the amount of $38.10 from IPIC Theatres, a movie theatre; a January 15, 2018 charge in the amount of $53.58 from NautiDawg Café; a January 12, 2018 charge in the amount of $70.53 from FragranceShop.com; a January 10, 2018 charge in the amount of $50.08 from food delivery service Delivery Dudes; a January 9, 2018 charge in the amount of $85.00 from the Palm Beach Zoo; a December 25, 2017 charge in the amount of $32 from a bar named 131 East Lounge; a December 24, 2017 charge in the amount of $41.00 at Hijinks Sports Grill; a December 17, 2017 charge in the amount of $98.05 from a steakhouse located in the state of Michigan named Klausen Steakhouse; a December 11, 2017 charge in the amount of $34.20 from Saquella Café; a December 11, 2017 charge in the amount of $49.33 for PF Changs; a November 20, 2017 charge in the amount of $42.48 from Delivery Dudes; a November 28, 2017 charge in the amount of $94.63 from Tree Town Christmas Trees, the Defendant indicated this was for the purchase of a Christmas tree; a November 24, 2017 charge in the amount of $85.17 at a restaurant called Max Grill's; two November 20, 2017 charges in the amount of $15.84 and $37.03 at a sushi restaurant named Kanpai Boca; a November 20, 2017 charge in the amount of $34 at a bar named 131 East Lounge; a November 16, 2017 charge in the amount of $42.48 from Delivery Dudes; a November 12, 2017 charge in the amount of $37.82 from Blue Martini; an

---

not currently conduct business and never conducted business.  In addition to the reporting fees, the Defendant continues to maintain a bank account in the name of Emotion Holdings at a cost of approximately $100 per year in fees.

[9] The Defendant maintained this charge was a mistake and that he was improperly charged for payroll services by ADP.  The Defendant testified that he called ADP and they said they would correct the improper charges, although the records do not reflect a corresponding credit for the charge in July 2017.

October 29, 2017 charge in the amount of $95.10 from El Balcon Las Americas; and an October 26, 2017 ATM withdrawal in the amount of $404.25.

The Defendant recently traveled to Las Vegas, where he stayed at the Bellagio Hotel and dined at various high-end restaurants in Las Vegas.  The Defendant testified, however, that his recent trips to Las Vegas, Nevada and Denver, Colorado were business-related.  The Defendant has also recently traveled to New York and Michigan for personal reasons.

On each of October 4, 2016, March 15, 2017, and September 29, 2017, the Defendant submitted a document titled Financial Statements of Debtor to the Government.  Government's Composite Exhibit 1; Government's Composite Exhibit 2; Government's Composite Exhibit 3.  The Defendant signed these statements affirming that the information therein and documents submitted therewith are true.  On each occasion, the Defendant stated that he received no monthly income.[10]  Thereafter, the Government presented the Defendant with Government's Exhibit 1-D, which reflects earnings statements from September 16, 2014, through September 15, 2016, and show payments of $1,583.39 per month to the Plaintiff.  As noted by the Government, the September 2016 payment reflected in Exhibit 1-D occurred just prior to the Defendant's submission of the October 4, 2016 Financial Statement of Debt.  The earning statements do not contain information regarding payments after September 2016.  Government's Exhibit 1-D.  Although the earning statements do not provide information regarding the payer of the monthly $1,583.39, the information contained therein is not inconsistent with the testimony of the Defendant that there was a significant decrease in his earnings around this time as a result of one of the companies for which he was providing

---

[10] On March 15, 2017, and September 29, 2017, the Defendant additionally submitted a Financial Statement for Business which reflected the same information as to income as the contemporaneously submitted Statements of Debtor regarding the Defendant's lack of income.  Government's Composite Exhibit 2; Government's Composite Exhibit 3.

consulting services, Pop's Pharmacy, ceasing operations. Pop's Pharmacy ceased operating in September 2016; the Defendant's verbal contract to provide consulting services to Pop's Pharmacy concluded in August 2016.

The Defendant also confirmed that, though the various financial statements he submitted to the Government indicated various expenses, none of the statements indicated that one of the Defendant's expenses was his court-ordered restitution payment. Government's Exhibit 1; Government's Exhibit 2; Government's Exhibit 3.

The Defendant testified that, as of the time of the hearing and excluding outstanding credit card debt associated with credit cards that are no longer active, he was current on all of his monthly bills.

III.   **FINDINGS OF FACT**[11]

Based on the testimony and exhibits presented at the evidentiary hearing, the undersigned makes the following findings of fact:[12]

1.   The Modification Order entered by this Court on November 21, 2017, required the Defendant to make restitution payments of $500.00 per month beginning on November 15, 2017.

2.   The Modification Order was clear and unambiguous and the Defendant was on notice of the Modification Order and aware that his restitution payments had been increased to $500.00 monthly.

3.   From November 2017 through at least April 20, 2018, the Defendant failed to make restitution payments in any amount.

---

[11] To the extent the Findings of Fact may be construed as Conclusions of Law the undersigned intends for them to be construed as such.

[12] These facts were established through the testimony of Defendant Jared D'Argenio and the exhibits introduced at the evidentiary hearing held on April 19, 2018, and continued to April 20, 2018, as well as, the Modification Order contained in the record.

4.      As of the hearing held on April 19, 2018, and April 20, 2018, the Defendant earned approximately $3,800.00 per month in income, exclusive of all fees, from Basalt America.  The Defendant additionally received income of $3,600.00 from North American Relocation in January or February 2018.

5.      As detailed at the hearing held on April 19, 2018, and April 20, 2018, the Defendant's monthly expenses, exclusive of food expenses and his restitution payments, totaled $2,837.00, which amount is consistent with the Defendant's testimony that after payment of expenses, $1000.00 of his $3,800.00 monthly income remains unspent.

6.      The financial records detailing the Defendant's spending demonstrate that he continues to spend significant amounts on non-essential items, including but not limited to dining out, home food delivery, and travel.

7.      From November 2017 to March 2018, the Defendant spent $1,123.82, or approximately $280.00 per month, on dining out at restaurants and restaurant delivery services alone.

IV.     **LAW & ANALYSIS**

A.      **The Court's Contempt Power**

District courts have inherent and statutory power to enforce their Orders and to punish violators for contempt. *Roadway Express. Inc., v. Piper*, 447 U.S. 752, 764-765 (1980). Civil contempt is a remedial sanction designed and intended to obtain compliance with a court order or to compensate for damages sustained as a result of noncompliance. *Piambino v. Bestline Prod.'s*, 645 F. Supp. 1210 (1986), citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1948).  In a civil contempt proceeding, the moving party must demonstrate by clear and convincing evidence that the underlying order was violated. *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the

16

grounds that he was unable to comply.  *Id.* (citation omitted). To find contempt, the court must determine that the order violated was clear and unambiguous and that the party to be charged had notice of the order but did not diligently attempt to comply.  *Popular Bank of Florida v. Banco Popular De Puerto Rico*, 180 F.R.D. 461, 465-66 (S.D. Fla. 1998) citing *In re E.I. DuPont De Nemours*, 99 F.3d 363, 372 (11th Cir.1996).  The failure to comply need not be with the intent to disobey a court order; indeed, intent to disobey is not a prerequisite to a finding of civil contempt. *Id.* Thus, the absence of willfulness does not relieve an entity from civil contempt.

Inability to pay is generally a defense to civil contempt; however, inability to pay is not a defense if the contemnor created the inability. *See e.g., Hodgson v. Hotard*, 436 F.2d 1110, 1116 (5th Cir. 1971); *Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1215 (S.D. Fla. 1986).  In order to succeed on the inability defense, the alleged contemnor "must go beyond a mere assertion of inability," *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984), and establish that he has made "in good faith all reasonable efforts" to meet the terms of the court order he is seeking to avoid. *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988); *Combs v. Ryan's Coal Co.*, 785 F.2d 970 , 984 (11th Cir. 1986).  Courts construe this requirement strictly, and thus even if the efforts made by defendants are "substantial," "diligent" or "in good faith," the fact that a defendant did not make "all reasonable efforts" to comply with the order, establishes that the defendant has failed to rebut the showing of contempt.  *Commodity Futures Trading Comm. v. Wellington Precious Metals, Inc.*, 950 F. 2d, 1529.  Thus, Defendants must show "categorically and in detail" why they are unable to comply. *Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210, 1215 (S.D. Fla. 1986) (citations omitted).

B.   Inability to Pay

As previously noted, the parties agreed at the hearing that the only remaining issue was a determination of whether the Defendant had a present inability to comply

17

with the Order, that the initial burden of production to prove such inability was on the Defendant, and that should the Defendant satisfy his burden, the ultimate burden of proof would then be on the Government to prove that he did have the ability to comply.

At the hearing on the motion, the Defendant argued that the Defendant was currently unable to pay restitution in the amount of $500.00 per month and had been unable to do so at all times since the entry of the Modification Order in November 2017. The Defendant did not attempt to make payment, in any amount, following entry of the Modification Order because he was unable to pay the full amount and did not believe that payment of a partial amount would prevent him from being held in contempt for failure to pay. The Defendant indicated he was able to pay $250.00 per month and was ready to begin making payments in that amount immediately.

The Defendant may be correct that the Government would still be entitled to seek to hold the Defendant in contempt for failure to pay the full amount of restitution required by the Modification Order. Regardless, however, this Court cannot find that the Defendant has made "in good faith all reasonable efforts" to meet the terms of the Modification Order when he has admitted that he had the ability to pay some amount towards restitution and did not. "[I]n this circuit, a party subject to a court's order demonstrates inability to comply only by showing that he has made "in good faith all reasonable efforts to comply." *United States v. Roberts*, 858 F.2d 698, 700–01 (11th Cir. 1988) citing *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir. 1976). And while the Defendant's payment of an amount less than $500.00 might not have foreclosed the possibility that the Government would seek to hold him in contempt, it would have put him in a position to argue that he made a good faith effort at compliance. *See Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990) ("Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance.") citing *Newman,* 740 F.2d at 1524.

18

Moreover, the evidence submitted regarding the Defendant's expenses and spending habits indicate that even if was unable to make the payments, such inability is of his own making, and thus cannot be raised as a defense. *S.E.C. v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla.), *aff'd*, 396 F. App'x 635 (11th Cir. 2010) ("[I]nability to pay is not a defense if the contemnor created the inability.").  The Defendant has conceded he was aware of the Court's Order and understood his obligation to make the restitution payments.  Nonetheless, he has failed to make even minor adjustments to his lifestyle in order to make the restitution payments.  For example, the Defendant argued at the hearing that he was only able to pay $250.00 per month.  The documents submitted by the Government, however, show that between November 2017 and March 2018, the Defendant spent an average of over $250.00 per month on restaurant dining and restaurant delivery services.  If the Defendant altered his eating habits and applied the money spent on restaurant dining each month to his longstanding restitution obligation, he could make the full $500.00 payment.  As another example, the Defendant makes monthly payments of over $500.00 on a 2017 Dodge Ram pick-up truck that additionally requires approximately $250.00 in gas expenditures each month.  By giving up his current vehicle for a smaller vehicle, or even a similar truck from a less recent year, the Defendant could save substantially on his vehicle expenses.[13]  These examples are neither exclusive nor exhaustive, but merely exemplify the Defendant's failure to demonstrate that he has made any effort to prioritize the payment of his restitution obligation over non-essential lifestyle expenses.

In any event, even if the Plaintiff had carried his initial burden to establish an inability to comply as of the entry of the Modification Order, which he has not, the Government has presented sufficient evidence to demonstrate that the Defendant was

---

[13] Notably, the Defendant's girlfriend, with whom he resides, has a separate vehicle on which she makes monthly payments of over $450.00.

able to comply.  The documents submitted by the Government, which were provided to

the Government by the Defendant and the veracity of which he does not dispute,

demonstrate that the Defendant has income of approximately $4,000.00 per month, which

or $3,800.00 after fees are deducted by PayPal for the use of its money-transfer service.

The Defendant's monthly expenses, as detailed at the hearing and exclusive of food

expenses and his restitution payments, totaled $2,837.00, which amount is consistent

with the Defendant's testimony that after payment of expenses, $1000.00 of his $3,800.00

monthly income remains unspent.  This expense amount includes the Defendant's

$572.00 car payment, and assumes no contributions by his girlfriend, with whom he

shares the residence, to the items detailed herein, despite her annual income of $48,000

to $50,000.[14]  The Defendant's expenses include a variety of non-essential expenses

which the Defendant has prioritized over his restitution payments.

Therefore, the undersigned finds that, based upon the evidence before the Court,

the Government has proven by clear and convincing evidence that the Defendant was

able to pay the restitution payments required by the Modification Order and did not do

so.  As a result, the undersigned concludes that the Defendant should be held in civil

contempt on the basis of his noncompliance with the terms of this Court's Modification

Order.

### V.   SANCTIONS FOR VIOLATION OF THE ORDER

As the undersigned has concluded that the Defendant should be held in civil

contempt, it is appropriate to determine what sanctions should be imposed for his

contemptuous conduct.

---

[14] Although the Defendant has significant outstanding debt, he has made no payment on the outstanding balance of his Barclays Black card or either of his outstanding lines of credit since prior to the entry of the Modification Order, and has continued to live a lifestyle that includes many non-essential expenses.  Thus, any attempt by the Defendant to raise his outstanding debt as the basis for inability to pay is unsupported and unconvincing.

A civil contempt sanction may serve to either (1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered as a result of the contemnor's act. *Sheet Metal Workers Local 441 Health & Welfare Fund, et al., v. Unatank Corp.*, 2008 WL 2163915 *2 (S.D. Ala. May 19, 2008) (citing *McGregor v. Chierico*, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000)).

The undersigned concludes that incarceration is a proper sanction for the Defendant's contempt of this Court's order.  Additional monetary sanctions are not appropriate to encourage the Defendants' compliance with this Court's Order, as though the undersigned rejects the Defendant's argument that he was unable to comply with the Modification Order at the time of the hearing, the imposition of additional monetary sanctions would be counterproductive to coercing the Defendant to make his restitution payments.  However, because incarceration of the Defendant may impair his ability to continue earning money to make his restitution payments, the undersigned recommends that the Court issue a conditional order, permitting the Defendant to avoid sanction by purging himself of this contempt through prompt compliance.  At the conclusion of the hearing, the Government requested that the Court permit the Defendant to purge himself of contempt by paying the amount of $3,000.00 in back restitution payments, which he could do through the use of his credit card, and making future monthly payments in the amount of $500.00, as previously ordered by the Court.  The undersigned finds that payment of the amount of restitution owed under the payment plan is an appropriate requirement to enable the Defendant to purge himself of the contempt.  If the Defendant fails to make future payments, that can be the subject of a future contempt hearing, which may be criminal rather than civil.  Thus, the undersigned recommends that the Defendant be taken into custody only if he fails to purge himself of this contempt within 15 days from the entry of an Order adopting this Report and Recommendation and holding him in contempt.

## VI.    <u>CONCLUSION</u>

Thus, based on the above findings and conclusions, and a review of the record as a whole, it is hereby

RECOMMENDED that Plaintiff United States of America's Motion for Order to Show Cause, ECF No. [261], be GRANTED.  It is further

RECOMMENDED that the Defendant be found to be in civil contempt of court for violating the Court's Order of November 21, 2017, ECF No. [261], by failing to pay $3,000.00 in restitution owed at the time of the hearing.  It is further

RECOMMENDED that the Defendant may purge himself of this contempt by paying $3,000.00 in restitution owed at the time of the hearing.  Should the Defendant fail to purge the contempt found herein by payment of $3,000.00 within 15 days of any Order adopting this Report and Recommendation, it is recommended that the Defendant be taken into custody and incarcerated until such time as he fully complies with this Court's Order.

The parties will have fourteen calendar days from the date of this Report and Recommendation within which to file written objections for consideration by the United States District Judge to whom this case is assigned.  Any response to objections must be filed within seven days from the date any objections are filed.  Any request for an extension of these deadlines must be made within seven calendar days from the date of this Report and Recommendation.  Pursuant to Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.

**DONE AND SUBMITTED** in chambers in Miami, Florida on January 3, 2019.

_Andrea M. Simonton_

**ANDREA M. SIMONTON**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**Copies furnished via CM/ECF to:**
**The Honorable Donald L. Graham, United States District Judge**
**All counsel of record**